FILED

2008 Aug-12  PM 02:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **MARJORIE S. BULLOCK,** | ) | |
| **PLAINTIFF,** | ) | |
| **VS.** | ) | **2:07-cv-451-JHH** |
| **THE ELASTIC CORPORATION OF AMERICA, INC.,** | ) | |
| | ) | |
| **DEFENDANT.** | | |

## MEMORANDUM OF DECISION

The court has before it the motion (doc. #20) of defendant The Elastic Corporation of America, Inc. (ECA) for summary judgment, and the motion (doc. #24) of plaintiff Marjorie S. Bullock for partial summary judgment, both filed on April 1, 2008.  Pursuant to the court's April 2, 2008 order, the motions were deemed submitted, without oral argument, on April 30, 2008, and the court considers both motions together.  For the reasons set forth below, defendant's motion is due to be granted in part and denied in part, and plaintiff's motion is due to be denied.

# I. Procedural History

Plaintiff Marjorie S. Bullock commenced this action on March 9, 2007 by filing a complaint in this court alleging violations of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-634, et seq., Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e, et seq., and the Equal Pay Act (EPA), 29 U.S.C. § 206(d).  More specifically, plaintiff contends that defendant's alleged conduct constitutes the following: (1) discrimination in her termination in violation of the ADEA; (2) discrimination in her pay on the basis of gender in violation of Title VII and the Equal Pay Act; (3) retaliation in her termination in violation of both the ADEA and Title VII.  (See Compl. ¶¶46-62.)  Defendant's April 1, 2008 motion for summary judgment asserts that there are no genuine issues of material fact and that defendant is entitled to judgment as a matter of law as to all plaintiff's claims.  Plaintiff's April 1, 2008 motion for partial summary judgment asserts that there are no genuine issues of material fact and that plaintiff is entitled to judgment as a matter of law as to her claim under the EPA.

Both parties have filed briefs and submitted evidence in support of their respective positions.  Defendant submitted a brief (doc. # 21) and evidence[1] (doc.

---

[1] The defendant submitted the following evidence: deposition of Marjorie Bullock; deposition of Ken Auman and selected exhibits; deposition of Jean Gould; affidavit of Ken Auman with exhibits; affidavit of Teri LeCroy; and affidavit of Stephanie Morgan.

#22) in support of its own motion for summary judgment on April 1, 2008. That same day, plaintiff also submitted a brief[2] (doc. #25) and evidence[3] (doc. #23) in support of her motion for partial summary judgment on the EPA claim. On April 22, 2008, plaintiff filed evidence[4] (doc. # 30) in opposition to defendant's motion for summary judgment, and filed her opposing brief (doc. # 32) on April 23, 2008. Defendant filed its brief (doc. #33) in opposition to plaintiff's motion for partial summary judgment on April 23, 2008.[5]  On April 30, 2008, defendant filed a brief (doc. #34) in reply to plaintiff's opposition. Despite having the opportunity to do so (see doc. #26), plaintiff did not file a brief in reply to defendant's opposition to her motion for partial summary judgment on the EPA claim.

---

[2] Plaintiff amended the last paragraph in her original brief under the heading "conclusion." (See docs. # 27, 28, 29.)

[3] The plaintiff submitted the following evidence: excerpts from deposition of Ken Auman; plaintiff's EEOC claim; Email showing promotion of Wayne Johnson to supervisor in the GG Handling Warehouse; Payroll change for Wayne Johnson from $12.25 per hour to $31,000 per year; Original answer of defendant, paragraph 18 where defendant states that she was to demonstrate her ability to fill the position vacated by Mr. Neives; deposition of Norma Jean Gould; affidavit of plaintiff.

[4] The plaintiff submitted the following evidence: second affidavit of plaintiff.

[5] Along with its opposition brief, defendant also filed a motion (doc. #31) to strike portions of plaintiff's first affidavit, submitted in support of her motion for partial summary judgment. On May 13, 2008, plaintiff filed a response (doc. #37) in opposition to the motion to strike. On August 6, 2008, the court granted (doc # 45) the motion to strike in full.

On June 30, 2008, after reading the briefs and evidence, the court ordered (doc. # 41) the plaintiff to respond to defendant's contention that the position held by plaintiff was eliminated.  On July 7, 2008, plaintiff responded (doc. #42) to the court's order; however, because plaintiff's response provided further confusion on the issue, the court ordered (doc. #43) defendant to reply to plaintiff's July 7, 2008 response.  Defendant filed a reply (doc. #44) on July 31, 2008.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transp., 229 F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  See Celotex Corp., 477 U.S. at 323.  After the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the

depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  See id. at 324.

The substantive law will identify which facts are material and which are irrelevant.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  See id. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Prop., 941 F.2d 1428 (11th Cir. 1991) (en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  See Fitzpatrick, 2 F.3d at 1115.  Once

the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  See Fitzpatrick, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the

6

movant, sufficient to withstand a directed verdict, or the non-moving party may

come forward with additional evidence sufficient to withstand a directed verdict

motion at trial based on the alleged evidentiary deficiency.  However, when

responding, the non-movant can no longer rest on mere allegations, but must set

forth evidence of specific facts.  See Lewis v. Casey, 518 U.S. 343, 358 (1996)

(citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### III. Relevant Undisputed Facts[6]

ECA[7] manufactures several textile products including narrow elastic tapes

and medical bands.   It has been plagued with financial difficulties over the last

few years.  (See Auman Aff. ¶¶ 5-7.)  For instance, over the past eight  years, ECA

has been forced to close four plants  because of economic and market pressures in

the textile industry.  (Id. ¶ 5.)  More than 1,600 employees have been either laid

off or discharged since  March  1, 2000.  (Id.)  Additionally, ECA's parent

_____

[6]  These are the facts for summary judgment purposes only.  They may not be the actual facts.  See Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts'") (citation omitted).  Where the facts are in dispute, they are stated in the manner most favorable to the non-moving party.  See Fitzpatrick, 2 F.3d at 1115.

[7]  Since Bullock's separation from ECA, the company has changed its name to Premier Narrow Fabrics, LLC.  (See Doc. #14.)  The court will refer to the defendant as ECA, however, as both parties have continued to do so.

company filed for bankruptcy in 2001, subsequently reorganizing and emerging from bankruptcy in 2002. (<u>Id.</u>)

As a result of this financial situation, ECA has been forced to adapt and change its operations and management for at least the last five years. (<u>Id.</u> ¶ 6.) In fact, ECA announced that, except for the retention of a few employees, it will close the Columbiana, Alabama facility, the one at issue in this case, and ECA's last production facility in the United States. (<u>Id.</u>) All of ECA's production activities are being transferred to a facility in Honduras. (<u>Id.</u>)

Bullock began her employment with ECA in July 1992 as a general laborer. (Bullock Dep. at 24; Compl. ¶ 10.) Throughout her employment, she held a variety of positions with ECA, and the court recounts only those parts relevant to the instant complaint. In August 2004, Nick Caldwell, the Chief Operating Officer, granted Bullock's request to transfer from beaming to the Greige Goods Warehouse. (Bullock Dep. at 24-26.) Pursuant to Caldwell's discussions with Bullock, her pay remained the same after the transfer at $10.50 per hour. ( <u>Id.</u> at 29.) Bullock also contends that Caldwell told her that her job title as "lead person" would not change when she moved to the warehouse. (<u>Id.</u> at 28-29.)

In her new position, Bullock testified that her duties were "to pull orders, print work orders, get them lined up and ready to go to the dyehouse and to help

8

Nelson Nieves," her supervisor.  (Id. at 28.)  Bullock spent "most of the day" on

the forklift, "unload[ing] the trucks, pull[ing] orders, [and] load[ing] trucks."  (Id.

at 30.)  Bullock testified that her supervisor[8]  was Nelson Nieves, and that John

Lloyd was a "supervisor" over Nieves.  (Id. at 28.)  Although Bullock testified

that, along with the plaintiff, Nieves also supervised Anita Jackson, who "ran the

elevator" and Mary Northcutt, who was a material handler who performed similar

functions on the forklift, (id. at 32), she also stated that she was the lead person

over Jackson  and Northcutt.  (Id.)

### A.  Nieve's Termination, Reassignment of his Duties, and Promise of a Raise

On or about May 10, 2005, Nieves was terminated.  (Auman Aff. ¶ 3;

Morgan Aff. ¶ 3.)  Bullock testified that the plant manager, Stephanie Morgan,

approached Bullock and told her that "they were going to let [Bullock] take over

Nelson's job."  (Bullock Dep. at 43.)  Bullock assumed many[9] of Nieves's job

---

[8] ECA maintains that Nieves was a lead person, and that Bullock was a "material handler." Bullock denies that she was a material handler and insists that she was a lead person. However, Bullock admits in her deposition that Nieves was her supervisor and also, in her brief, admits that Nieves was a lead person.  The court notes this inherent contradiction and confusion, but does not attempt to resolve it as it is immaterial to the court's ultimate decision.

[9] Although Bullock testified that she assumed Nieve's position in full, a closer look at her deposition testimony reveals that she did not assume all of his duties.  See infra at Section B.1.a; see also doc. # 45.

duties -- primarily the ones related to the Honduras facility.[10]  She performed the

billing, invoicing, setting up of the Honduras trucks and created the export

documentation for the containers being shipped to Honduras.  (Id. at 43, 48.)

After creating the export documentation for the Honduras containers, however, she

turned the invoicing and billing over to Michelle Nielson.  (Id. at 48.) Bullock also

assumed Nieves' job of the physical count of the pallets.[11]  (Id. at 49.)  Bullock did

not review inventory levels in the warehouse or perform inventory transactions if

there was a problem adjusting inventory, as Nieves had previously done.  (Id. at

46.)  In addition, although Nieves kept up with employee work hours, maintained

their time cards, and handled their payroll information, (Morgan Aff. ¶ 2), Bullock

testified that she did not assume these responsibilities because John Wood took

over these duties before Nieves was terminated.  (Bullock Dep. at 44.)

       When she agreed to take over these additional duties, Bullock asked

Morgan and Lloyd if she would receive a raise.  (Id. at 43, 49.)  Bullock testified

that she was told that after she received the necessary training, if she could do the

job, her pay would be increased.  (Id. at 49.)  Bullock was trained on the billing and

---

[10] ECA has a plant in Honduras.  The material manufactured in the Columbiana plant, where plaintiff worked, was packed in containers and shipped to Honduras to be further processed.  (Bullock Dep. at 38.)

[11] ECA disputes that Bullock performed this duty.  (Morgan Aff. ¶ 2.)

invoicing system on the computer regarding the materials going to Honduras by Morgan and others, and began performing those responsibilities.  (Id. at 50-51.)

About a month later, after she completed the training and was performing the new, additional duties, Bullock approached John Lloyd about the promised raise.  (Id. at 54.)  Bullock testified that Lloyd told her that "he would get with Stephanie [Morgan] and find out when the raise was coming through . . . ."  (Id. at 55.)  Bullock approached Lloyd  two other times about her raise, about "every two weeks" when she saw that there was no raise reflected in her paycheck.  (Id. at 58.)  Bullock stated that Lloyd told her on each occasion that "it was going to take a little time, but they were going to get it."  (Id. at 56.)

In mid-summer 2005, about six weeks after first speaking to Lloyd about the pay raise issue, Bullock spoke to Morgan about her pay concerns.  (Id. at 56-58.)  Bullock went to Morgan's office and asked Morgan why she had not received the promised raise.  (Id. at 56.)  Bullock testified that Morgan told her that "she was going to set me up with the people that did the billing and the office billing" for "bi-monthly pay" but that "it was going to take a couple of weeks."  (Id. at 57.)

On September 1, 2005, Bullock received a raise, but it was not the one promised to her by Morgan and Lloyd.  (Id. at 59-60.)  Her pay was raised from $10.50 an hour to $10.75 an hour.  (Id. at 60.)  The raise was company-wide.  (Id.)

11

Bullock asked Morgan about her promised raise on one other occasion, but she never heard anything other than "it was going to take a little time." (Id.) Bullock never received a raise for assuming the additional responsibilities. (Id.)

### B. Jean Gould Becomes Supervisor of Warehouse

Around the same time, in September 2005, Jean Gould replaced Lloyd as the manager the Greige Goods Warehouse. (Id. at 61-63.) Gould informed the employees in the warehouse that "things [were] going to stay as-are until [she] got familiar with the area" and told the employees to continue working as they had been. (Id. at 66.) Bullock denies that Gould ever informed her that she was not a lead person or that a meeting occurred where Gould told the other employees in Bullock's department that she was not a lead person.[12] (Id. at 67.) Bullock also denies any conversation with Gould that other employees had problems working with Bullock. (Id. at 69.)

Soon after Gould assumed the manager position, Bullock approached Gould and told her about the raise she had been promised but never received. (Id. at 64-65.) Gould told Bullock that she would have to talk to Lloyd and Morgan about it, but Gould never got back to Bullock about the promised raise. (Id. at 65, 67.)

---

[12] Later in her deposition, however, Bullock admits that Gould told her that "nobody had to answer to [Bullock]." (Bullock Dep. at 76.) In addition, she admitted that Gould told Anita Jackson and Mary Northcutt that they did not have to report to Bullock. (Id. at 109-10.)

*C.  Kaizen Process*

In the fall of 2005 and into 2006, ECA implemented lean manufacturing techniques though a procedure known as a Kaizen process.  (Morgan Aff. ¶ 7.) ECA obtained a grant with the assistance of Auburn University to implement the Kaizen process at the facility where Bullock worked.  (Id.)  Employee groups, called kaizens, were formed for various departments to review and evaluate work processes within each department, including the Greige Goods Warehouse.  (Id.) The kaizen then made recommendations for making operations more efficient. (Id.) Kaizen in the Greige Goods Warehouse worked primarily during the week of October 25-29, 2005.  (Morgan Aff.)

As a result of the kaizen process, there was a change in how work flowed in the warehouse.  (Bullock Dep. at 103.)  Bullock admitted that the operations became more efficient in the warehouse because it reduced the time it took to "pull the web" and it made "the flow of the disposition of yard a lot easier."  (Id.)  The process was much more organized after the implementation of the recommendations of the kaizen process.  (Id.)  The resulting efficiency, however,

13

reduced the need for so many employees to be performing certain jobs in the
warehouse.[13]  (Morgan Aff. ¶ 8.)

### D.  Problems Between Bullock and Gould

In October 2005, shortly after Gould's arrival at the Greige Goods
Warehouse, Bullock began having problems with Gould.  (Bullock Dep. at 69-71.)
Bullock described these problems as a "personality conflict."  (Id. at 77.)  She
testified that she was "left out" and "not includ[ed] . . . into [sic] the little meetings
[Gould] was having with the other girls."[14]  (Id.)  Gould was changing things in
the warehouse and was not letting Bullock know when employees were going to
be absent, as Lloyd had done in the past.  (Id. at 75-76.)  Bullock contends that she
needed to know when someone was absent so she could find someone to cover
that position.  (Id. at 77.)  Gould, however, told Bullock that she did not need to
know such information, and that "nobody had to answer to [Bullock]."  (Id. at 76,
77.)  In fact, Gould instructed Anita Jackson and Mary Northcutt that they did not
have to report to Bullock.  (Id. at 109-10.)  Bullock confronted Gould with her

---

[13] Although plaintiff states in her brief that she disputes this statement, plaintiff has not
provided the court with any <u>evidence</u> disputing this statement.

[14] In describing such meetings, Bullock stated that she would find out about the meetings
after they occurred, for instance, when Gould would change a process in the warehouse.
(Bullock Dep. at 78.)  Bullock testified that those changes affected her, but she was never
reprimanded for doing anything incorrectly.  (Id.)

feelings and testified that she "was at a loss" and "didn't know what [she] was supposed to do." (Id. at 77.)  She approached Gould and asked Gould what she expected of Bullock.  (Id. at 70.)  Gould replied that Bullock should do her job. (Id. at 71.)

There was also a specific incident between Bullock and Gould concerning a problem with a truck driver who came to pick up a load.[15]  (Id. at 76.)  According to Bullock, three trucks had left that week, but one picked up the wrong trailer. (Id.)  Gould "had talked to the truck driver and the truck driver said that the truck [with the wrong trailer] had been picked up." (Id. at 76.)  Bullock, however, contends that the truck had not left, but that Gould "had the trucks mixed up." (Id. at 70, 76.)  Bullock testified that Gould "practically called [Bullock] a liar about" the incident.  (Id. at 70.)

Bullock reported those problems to Ken Auman in human resources.  (Id. at 69.)  Bullock told Auman that she did not know what she was supposed to be doing any more because of the things happening with Gould.  (Bullock Dep. at 79.) Auman asked Morgan and Gould come to his office to discuss the situation. (Id. at 75.)  After Gould reiterated her problems with Gould, Bullock contends that Gould responded by stating that Bullock was lying about the truck.  (Id. at 79.)

---

[15] Bullock's testimony regarding this incident is incomplete and confusing.

Bullock could not remember the other things discussed by Gould, but testified that Auman and Morgan did not say anything in the meeting.  (Id. at 79-80.)  After about twenty minutes, the meeting ended with Bullock going back to work.  (Id. at 80.)  Gould remained in Auman's office.  (Id.)

According to Bullock, later that day, Gould confronted Bullock.  (Id.)  Bullock contends that Gould, "in a very loud voice . . . asked everybody to leave out of the office[16] so that we could have words, that she needed to talk to [Bullock]."  (Id. at 81.)  Gould "told [Bullock] under no circumstances was [Bullock] ever to go back to human resources without going through her first." (Id. at 81-82.)  Bullock replied that she "had a right to go to human resources; that they had an open-door policy."  (Id. at 82.)  Gould, however, said "Do you understand me?  You are not to go back upstairs to human resources without going through" Gould.  (Id.)   Gould then left the office, and Bullock called Auman and told him what happened.  (Id. at 82-84.)  Auman assured Bullock that there was an open-door policy and that "he would take care of [Gould] after three o'clock because he had a meeting."  (Id. at 85.)  Bullock does not know what happened after that, other than the fact that Gould avoided Bullock.  (Id.)

---

[16] The office is a small tin building in the middle of the warehouse, holding a couple of desks and a computer.  (Bullock Dep. at 81.)

*E.  Bullock's Employment Ends*

On November 18, 2005, at the end of her shift, Bullock was called to Morgan's office.  (Id. at 96, 97.)  When she got to Morgan's office, Gould was also present and Auman was on the phone.  (Id. at 96.)  Morgan informed Bullock that "there was going to be a cutback, and that [she] had an option to go back to beaming,[17] and with a cut in pay for nine-ninety an hour, or a layoff."  (Id. at 100.) Bullock told Morgan that she "could not take a cut in pay."  (Id.)  Auman then "spoke up and he said that there was being [sic] cutbacks all over the plant and paychecks had to be cut too."  (Id. at 100-01.)  Bullock continued to insist that she could not take a pay cut, and Morgan told her that she would be laid off.  (Id. at 102.)  Bullock denies quitting her employment.  (Id. at 101-02.)  Bullock was 52 years old when she separated from ECA.  (See Pl. Ex. 2.)

After plaintiff's discharge, Wendall Robinson, an existing employee, age 46, assumed Bullock's responsibilities related to the shipments to Honduras. (Gould Dep. at 38.)  Robinson executed these duties in a different way than the way Bullock performed them, and within a few months, the entire process was changed to a new computer program.  (Id. at 39-40, 43-49.)  Bullock's forklift and

---

[17] Before working in the warehouse, Bullock was a lead person in the beaming department.  (Bullock Dep. at 101.)  They told her that she could return to her previous job, with the pay cut.  (Id.)

other duties were assumed by both Robinson and Northcutt, age 47.[18]  (Auman

Aff. ¶ 8.)

## IV.  General Framework

In an employment discrimination case, the plaintiff maintains the ultimate

burden of proving that the adverse employment decision was made because of

intentional discrimination.  See Reeves v. Sanderson Plumbing Prods., Inc., 530

U.S. 133, 134 (2000); St. Mary's Honor Center v. Hicks, 509 U.S. 502, 509-12

(1993); Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1184 (11th Cir.

1984).  In general, a plaintiff may attempt to establish a claim of illegal

employment discrimination through the use of direct evidence, circumstantial

(indirect) evidence, or statistics.  See id.; see also Schoenfeld v. Babbitt, 168 F.3d

1257, 1266 (11th Cir. 1999).  The Supreme Court established the basic allocation

of burdens and order of proof in a disparate treatment case,  McDonnell Douglas

Corp. v. Green, 411 U.S. 792 (1973); Texas Dep't of Cmty. Affairs v. Burdine,

---

[18] Although plaintiff's brief contends that Wayne Johnson assumed Bullock's position, in full, she provides no evidence for such contention.  The only citation the court can find to support this contention is to her EEOC charge. Such evidence does not create a genuine issue of material fact in light of the evidence presented by defendant.  The EEOC charge is nothing more than plaintiff's sworn statement of her contentions, not evidence.  In fact, in plaintiff's deposition, she admitted that she had no personal knowledge of Johnson's duties after her separation from ECA. (Bullock Dep. at 107.)  The only admissible evidence regarding Johnson's duties is that presented by ECA, which clearly show that Johnson performed duties different than those performed by plaintiff.  In fact, Johnson did not perform any of Bullock's previous duties.  (See Gould Dep. at 77; Morgan Aff. ¶¶10.)

450 U.S. 248 (1981), as modified by <u>Desert Palace v. Costa</u>, 539 U.S. 90 (2003),

and that allocation scheme applies only in cases where there is no direct evidence

of discrimination, <u>Grigsby v. Reynolds Metals Co.</u>, 821 F.2d 590, 595 (11th Cir.

1987).  Here, plaintiff does not present direct evidence of discrimination, but

proceeds with her claims using circumstantial evidence.[19]

Under the <u>McDonnell Douglas</u> and <u>Burdine</u> framework, a plaintiff first has

the burden of proving by a preponderance of evidence a prima facie case of

discrimination, which creates a rebuttable presumption that the employer acted

illegally.  <u>Combs v. Plantation Patterns</u>, 106 F.3d 1519, 1527-28 (11th Cir. 1997).

The methods of presenting a prima facie case, as well as the exact elements of the

case, are not fixed; rather they are flexible and depend to a large degree upon the

facts of the particular situation.  <u>See</u>, <u>e.g.</u>, <u>Nix</u>, 738 F.2d at 1185 (11th Cir. 1984);

<u>Lincoln v. Bd. of Regents of Univ. Sys.</u>, 697 F.2d 928, 937 (11th Cir. 1983).  Once

the plaintiff proves a prima facie case, the burden of production shifts to the

---

[19] This is an assumption by the court, reading plaintiff's brief extremely liberally.  In fact, the court has gone to great lengths to understand the argument, if it can be called such, made by plaintiff.  Plaintiff's briefs to this court, in opposition to defendant's motion for summary judgment and in support of her motion for partial summary judgment, contain very little traditional argument or citation to the guiding case law.  Instead, plaintiff presents her "argument" to the court in short spurts of alleged disputed facts.  The plaintiff is lucky that this judge took such effort to decipher an argument from the briefs presented and did not require plaintiff to properly re-brief the issues to the court, as other judges in this courthouse most certainly would have done.

defendant to articulate a legitimate, nondiscriminatory reason for its employment decision.  See  Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir. 2001); Combs, 106 F.3d at 1528.  The employer "need not persuade the court that it was actually motivated by the proffered reasons."  Burdine, 450 U.S. at 254-55; see Chapman, 229 F.3d at 1024.  If the employer satisfies that burden by articulating one or more such reasons, then the presumption of discrimination falls and the burden of production again shifts to the plaintiff to offer evidence sufficient for a reasonable jury to conclude that the employer's supposedly legitimate reason is merely a pretext for illegal discrimination.[20]  A plaintiff may accomplish this by either proving by a preponderance of the evidence that intentional discrimination did indeed motivate the defendant or by producing sufficient evidence to allow a rational trier of fact to disbelieve the employer's proffered legitimate reasons, thus permitting but not compelling the trier of fact to make a finding of illegal discrimination.  See Reeves, 530 U.S. at 147-48;  St. Mary's Honor Ctr., 509 U.S. 502 (1993); Abel v. Dubberly, 210 F.3d 1334, 1339 (11th Cir. 2000); Alexander v. Fulton County, 207 F.3d 1303, 1336 (11th Cir. 2000); Combs, 106 F.3d at 1529-38 (interpreting Hicks and the post-Hicks case law); Hairston v. Gainesville Sun

---

[20] If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it.  Simply quarreling with that reason is not sufficient.  Chapman, 229 F.3d at 1030.

Publ'g Co., 9 F.3d 913, 920-21 (11th Cir. 1993). A plaintiff may also prove

pretext by presenting sufficient evidence  for a reasonable jury to conclude that

discrimination was a "motivating factor" for the employment action, even though

defendant's legitimate reason may also be true or have played some role in the

decision. McDonnell Douglas, 411 U.S. at 802-05; Burdine, 450 U.S. at 252-54;

Desert Palace, 539 U.S. at 101-02.

## V.  Analysis

Plaintiff's complaint contains the following claims: (1) discrimination in her

termination in violation of the ADEA; (2) discrimination in her pay on the basis of

gender in violation of Title VII and the EPA; (3) retaliation in her termination in

violation of both the ADEA and Title VII.  With regard to her last claim, in her

opposition to defendant's motion for summary judgment, plaintiff states that

although she "does not abandon [her retaliation] claim, plaintiff agrees with the

argument presented by the defendant."  (Pl. Opp. Br. at 27.)  The court deems this

bizarre pairing of words as a concession that defendant is entitled to summary

judgment on plaintiff's retaliation claim, and the court will not address this claim.

The court will address plaintiff's remaining claims separately below,

although not in the order presented by the parties.  The court has coupled the

claims in such a way as to reduce duplication of law and facts.  First, the court

addresses plaintiff's claims that she was terminated because of her age, in violation of the ADEA.  Then, the court addresses plaintiff's  pay claims together, under both the EPA and Title VII.

### A.  Termination in Violation of the ADEA

Bullock contends that she was illegally terminated and replaced by a younger, less qualified employee in violation of the ADEA.  Defendant contends that Bullock cannot establish a prima facie case of age discrimination.  In the alternative, defendant contends that Bullock has failed to offer evidence sufficient for a reasonable jury to conclude that the defendant's legitimate reason for its action is merely a pretext for age discrimination.

Before the court begins its analysis of Bullock's claim, the court starts with a point that neither of the parties addressed in the initial briefing, and only marginally addressed when ordered by the court.  (See docs. # 41-44.)  As the court understands the arguments and evidence, Bullock's termination was a reduction in force.  The undisputed evidence shows that Bullock's position was completely eliminated and that no one person assumed Bullock's previous position.[21]  See Smith v. J. Smith Lanier & Co., 352 F.3d 1342, 1345 (11th Cir.

---

[21] Although plaintiff repeatedly argues that her position was not eliminated and that Wayne Johnson replaced her, she presents no evidence to support this argument.  See supra footnote 18.  Instead, the undisputed evidence establishes that Wendall Robinson assumed

2003) (defining reduction in force as "where a position is eliminated in its
entirety).  Moreover, defendant argues that the decision to eliminate plaintiff's
position and offer her another job at a lower rate of pay was due to streamlining of
the work process and efforts to cut costs.  (See Morgan Aff.¶¶ 7-8; Auman Aff. ¶¶
5-7; Auman Dep. at 36.)

The parties, however, argue the traditional termination model in discussing
plaintiff's claim of age discrimination.  Although the court parts ways with the
parties in its analysis of plaintiff's age claim, the court need not resolve this
internal dispute.  Instead, the court will assume that Bullock established a prima
facie case under either the reduction-in-force model or the traditional termination
model, and turn directly to the issue of pretext, as ECA has come forth with a
legitimate, nondiscriminatory reason for Bullock's termination.

ECA states that Bullock was terminated "during continuous and dramatic
changes in Defendant's operations and labeled as a layoff after she refused to
accept another job at a slightly lower rate of pay."  (Def. Br. at 15.)  As a result of
its financial situation, ECA was in the process of streamlining its process and
workforce, in an attempt to remain viable.  (See Auman Aff. ¶ 5-7.)  As explained

_____

Bullock's responsibilities related to the shipments to Honduras, (Gould Dep. at 38), and her
forklift and other duties were assumed by both Robinson and Mary Northcutt. (Auman Aff. ¶ 8.)

23

by Auman in his deposition, the reason ECA "chose [Bullock] to be the person to

either bump back to a salary cut or to be laid off" was because

> [t]he other ladies [performing the same duties as Bullock] were
> already making the lower rate, and [Bullock] was not making the
> lower rate; she was making more.  Because she was part of why –
> cleaning up the sheet.  There were several people involved that had
> been in other jobs, and had moved to other jobs, and were being
> cleaned up.  So now everybody who does the same work is at the
> same rate of pay.  She was chose[n] because she was out, and they
> were all doing the same thing.  So we asked her to bump back and
> take that lower rate in pay, lower grade of pay.  She had the job.  It
> was just cleaning that part of it up.  And because we needed to
> eliminate one, the plan was that she would go back to that [her
> previous position in beaming], and then we would lay off the least
> senior one of those ladies [remaining].

(Auman Dep. at 37-38.)  In essence, ECA wanted to retain Bullock in her previous

position in beaming, but because of the economic circumstances the company

faced, it was unable to pay her more than $9.90 per hour, the same amount made

by the other employees performing the same duties.  (Id. at 32-38, 55.)  Instead of

taking the lower paying job, plaintiff chose to end her employment with ECA.

(Bullock Dep. at 101-02.)

     Bullock must now come forward with evidence "that the reasons given by

the employer were not the real reasons for the adverse employment decision."

Chapman, 229 F.3d at 1024.  Plaintiff presents four arguments to satisfy her

burden.   First, Bullock argues that she was replaced by someone much younger.

24

(Pl. Opp. Br. at 24.)  Second, she contends that the decisionmakers did not have a good faith belief in their reasons for eliminating her position.  (Id. at 24-25.) Third, Bullock contends that defendant cannot rely on the fact that two of the three decisionmakers were over the age of 40 because, "Morgan, the highest ranking decision-maker" was 38.  (Id. at 26.)  Finally, Bullock argues that after Bullock's position was eliminated, ECA actually increased the number of employees performing her same duties.  (Id.)  These arguments fail.

The mere fact that Bullock was allegedly replaced by someone substantially younger does not establish that she was terminated because of her age.  First, as explained above, there is no evidence that Johnson, age 33,[22] replaced Bullock. Instead, the individuals who assumed plaintiff's job duties, Wendall Robinson and Mary Northcutt, were 46 and 47, respectively.  (See Auman Aff. ¶ 2.)  As Bullock was 52 at the time of her termination, 5-6 years separated her from the employees who assumed her duties.

Although this age difference may be sufficient to establish the "substantially younger" prong of the prima facie case, see Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1360 (11th Cir. 1999), it is insufficient to establish

---

[22] Although Bullock contends that "Johnson was in his early 20's" (Pl. Opp. Br. at 24), the admissible evidence shows that Johnson was born on 5/4/1972, making him 33 at the time of Bullock's termination.  (See Auman Aff. ¶ 2.)

discriminatory intent.  If such evidence were sufficient to establish the necessary intent, a plaintiff would succeed in defeating summary judgment on every occasion where the plaintiff established the "substantially younger" element of the prima facie case.  Such a result certainly is not supported in the Eleventh Circuit's case law regarding age discrimination.  Instead, evidence of actual intent and/or animus must be presented or inferred from the discrediting of the legitimate, nondiscriminatory reason.  See id. at 1361-62.  Looking at the evidence as a whole, the 5-6 year age difference of the employees who assumed her job responsibilities does not establish the requisite intent.

As to plaintiff's second argument regarding the good faith belief of the decisionmakers, the court is at a loss as to plaintiff's reasoning as to how this establishes pretext.  Plaintiff argues that the decisionmakers did not actually believe that Bullock was having performance problems.  Whether or not this argument is supported by the record is irrelevant.  Defendant chose to eliminate plaintiff's position and offer her another job at a lower rate of pay not because of her performance but due to streamlining of the work process and efforts to cut costs.  (See Morgan Aff.¶¶ 7-8; Auman Aff. ¶¶ 5-7; Auman Dep. at 36.)  Nowhere does defendant argue that the adverse decision was made because of poor

performance.  As such, this argument is not probative as to the ultimate issue of intent to discriminate.

Furthermore, contrary to plaintiff's third argument, that two of the three members of the group that chose to eliminate Bullock's position were actually older than Bullock and within the protected age group suggests, not that they were likely to discriminate, but the exact opposite.  As the Eleventh Circuit has explained, those who are themselves within a protected group are less likely to discriminate than those outside the group because those within the group "are more likely to be the victims of age discrimination than its perpetrators."  Elrod v. Sears, Roebuck and Co., 939 F.2d 1466, 1471 (11th Cir. 1991).  In addition, there is no evidence that Morgan, age 38, was the ultimate decisionmaker or that she held such influence over the other two decisionmakers as to taint the decision.

Plaintiff's final argument fairs no better than her first three.  Although she does attempt to attack defendant's reasoning for the elimination of her position, plaintiff does not have any evidence to support her argument.  She contends that after ECA eliminated her position, defendant "turned right around and brought in Wendall Robinson . . . [and] Wayne Johnson . . . [which] actually increased" the number of employees.  (Pl. Opp. Br. at 26.)  This statement is not accurate, however.  The evidence establishes that the number of employees in the

27

warehouse actually remained the same; the major difference was that ECA was now paying one person less for the same amount of work.  The material handlers remained, including Northcutt who assumed some of Bullock's forklift duties. Robinson, who assumed the remainder of Bullock's responsibilities, was also an existing employee who retained his previous duties.  (Gould Dep. at 38-44.) And, Johnson, as discussed in detail below, did not assume any duties previously performed by Bullock, but a new position was created "to perform job tasks that had been reassigned to various employees after other employees had left [ECA] over the previous months." (Morgan Aff. ¶ 9-10.)  His position was created to aid in the task of [mak[ing] operations more effective and efficient." (Id. ¶ 9.)  The physical presence of the addition of Johnson does not change the fact that ECA was now paying one employee less for the work Bullock performed while she was employed.

Simply put, plaintiff presented no evidence that she was terminated because of her age.  Defendant provided ample reasons for the reason to eliminate plaintiff's position.  Moreover, defendant wanted plaintiff to remain an employee and offered her another job at a salary of $9.90 per hour, less than $1.00 less per hour than she was then paid.  Plaintiff has not submitted any evidence that this decision was motivated by age or that the reason articulated by plaintiff is false.

28

Mere speculation and conjecture that age was a factor is insufficient.  See Carter v. City of Miami, 870 F.2d 578, 585 (11th Cir. 1989). As such, ECA is entitled to judgment as a matter of law on plaintiff's age discrimination claim.

### B. Title VII Sex Discrimination Claim for Unequal Pay and Equal Pay Act Claim

Bullock contends that ECA violated Title VII and the EPA when it paid her less wages than two male employees for the same work: Nelson Nieves and Wayne Johnson.  Gender-based discrimination in rates of pay to employees is prohibited by both the EPA and Title VII.  The EPA was directed only at wage discrimination between the sexes and forbids the specific practice of paying unequal wages for equal work to employees of the opposite sex.   Title VII also forbids discrimination on the basis of gender, among other protected traits.  Thus, plaintiff has two tools for relief, of which both provide different burdens of proof and may produce different amounts of compensation.  See Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1527 (11th Cir. 1992).

### 1.  Equal Pay Act

To establish a prima facie case under the EPA, a female employee "must show that an employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and

responsibility, and which are performed under similar working conditions.'"

Corning Glass Works v. Brennan, 417 U.S. 188, 195 (1974) (quoting 29 U.S.C. §

206(d)(1)).   Although formal job titles or descriptions may be considered, the

controlling factor in the court's assessment of whether two jobs are substantially

equal must be actual job content.  Miranda v. B & B Cash Grocery Store, Inc., 975

F.2d 1518, 1533 (11th Cir. 1992); Arrington v. Cobb Cty., 139 F.3d 865, 876

(11th Cir. 1998).  Thus, "[t]he prima facie case . . .  focuses solely on the primary

duties of each job, not duties that are incidental or insubstantial." Miranda, 975

F.2d at 1533.

    A plaintiff need only demonstrate that the jobs at issue are substantially

similar, not identical.[23]  Miranda, 975 F.2d at 1533.  Nonetheless, "[t]he standard

for determining whether jobs are equal in terms of skill, effort, and responsibility

is high."  Waters v. Turner, Wood, & Smith Ins. Agency, Inc., 874 F.2d 797, 799

(11th Cir. 1989).  Indeed, plaintiff's EPA burden of proving that their positions are

---

    [23] When Congress drafted the EPA, it substituted "equal" for "comparable" to indicate
that "the jobs involved must be virtually identical, that is, they would be very much alike or
closely related to each other."  Brennan v. City Stores, Inc., 479 F.2d 235, 238 (5th Cir. 1973).
More recently, the Eleventh Circuit echoed that observation: "Congress manifested its intent to
narrow the applicability of the Act . . . . [and] intended to permit employers wide discretion in
evaluating work for pay purposes.  Therefore, although employees do not have to prove jobs are
identical, they have the heavy burden of proving 'substantial identity of job functions.' " Waters,
874 F.2d at 799.

equivalent to the positions of their comparators is a more difficult burden than the comparison which must be made to support their Title VII claims.  <u>Miranda</u>, 975 F.2d at 1526

     After a plaintiff makes out a prima facie case, the burden shifts to the employer to prove that the difference in pay is justified by one of four exceptions: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) a differential based on any other factor other than sex.  <u>See</u> 29 U.S.C. § 206(d)(1).  The burden to prove these affirmative defenses is heavy, and the defendant must demonstrate that " the factor of sex provided no basis for the wage differential."  <u>Mulhall v. Advance Sec., Inc.</u>, 19 F.3d 586, 590 (11th Cir.1994).   In fact, the Eleventh Circuit has noted "the difficulty inherent in disposing of such an issue by way of summary judgment" because "[c]redibility and the weight to be given such 'explanations' are traditionally matters left to the consideration of fact finders."  <u>Id.</u> at 595.

     If the employer fails to meet its burden, the plaintiff wins -- plaintiff is not required to prove discriminatory intent on the part of the defendant.  <u>See</u> <u>Mitchell v. Jefferson County Bd. of Ed.</u>, 936 F.2d 539 (11th Cir. 1991).  "When the defendant overcomes the burden, the plaintiff must rebut the explanation by showing with affirmative evidence that it is pretextual or offered as a post-event

justification for a gender-based differential." Irby v. Bittick, 44 F.3d 949, 954

(11th Cir. 1995) (citing Schwartz v. Florida Bd. of Regents, 954 F.2d 620, 623

(11th Cir. 1991); Hodgson v. Behrens Drug Co., 475 F.2d 1041, 1045 (5th Cir.

1973)).  If plaintiff is able to create the inference of pretext, there is an issue which

should be reserved for trial.  Irby, 44 F.3d at 954.

### a.  Nelson Nieves

Bullock contends that ECA violated the EPA when it paid Nelson Nieves

more for equal work.  Defendant does not dispute that Nelson Nieves was paid

more than Bullock.  Instead, ECA contends that Bullock failed to establish a prima

facie case under the EPA because Bullock "did not perform the same duties as . . .

Nelson Nieves."  (Def. Br. at 21.)  Although not couched in the correct EPA terms,

defendant essentially argues that Bullock did not perform a job equal in terms of

effort.  The other prongs of the tripartite test[24] are not in dispute, and the court

does not address them.

"Effort is concerned with the measurement of the physical or mental

exertion needed for performance of a job.  Job factors which cause mental fatigue

and stress, as well as those which alleviate fatigue, are to be considered."  29

---

[24] Plaintiff must also establish "similar working conditions," which has been interpreted
to relate only to surroundings or hazards of the job. 29 C.F.R. § 1620.18.  Because that aspect of
the prima facie case is not in dispute, the court does not analyze it here.

C.F.R. § 1620.16(a).  As noted earlier, the court's analysis must focus not on the incidental or insubstantial duties of a job, but on the "primary duties" -- a term of art throughout the EPA jurisprudence of the Eleventh Circuit, but not clearly defined.  At a minimum, "primary" refers to the significance of a duty when viewed as a component of overall job content.  See, e.g., Miranda, 975 F.2d at 1533.  Primary duties cannot be incidental, nonessential, or unimportant.  Id.

Less clear in the "primary" analysis, however, is what importance should be placed on the amount of time devoted to a duty.  Although the effort required of two jobs may be deemed unequal if one job demands the performance of an additional duty that takes up a substantial amount of time, see Hodgson v. Brookhaven Gen'l Hosp., 436 F.2d 719, 725 (5th Cir. 1970), time alone is not the determinative factor of what duties are "primary" to job content.  "[A] wage differential can be justified for employees who are available to perform an important differentiating task even though they do not spend large amounts of time at the task."  Marshall v. Dallas Indep. Sch. Dist., 605 F.2d 191, 195 (5th Cir. 1979); see also Mulhall, 19 F.3d at 593 (even in the absence of evidence "of the time actually spent" in the investigative function of the purported comparator's job, the skills related to that function are "more than an incidental part" of his job as a whole, rendering the jobs incomparable).

33

Nieves had seven duties as supervisor of the Greige Goods warehouse:

(1) Completed work orders as goods came down elevator from weave and knit areas (Morgan Aff. ¶ 2);
(2) Reviewed inventory levels in warehouse and performed inventory transactions to correct any problems (Bullock Dep. at 46; Morgan Aff. ¶ 2);
(3) Scheduled containers to be sent to Honduras (Morgan Aff. ¶ 2);
(4) Created export documentation for containers being sent to Honduras (Bullock Dep. at 48; Morgan Aff. ¶ 2);
(5) Invoicing and billing for Honduras trucks (Bullock Dep. at 33);
(6) Responsible for physical count of pallets (Bullock Dep. at 48-49; Morgan Aff. ¶ 2); and
(7) Supervised Greige Goods warehouse personnel, kept up with employee work hours, maintained time cards and handled employee payroll information (Bullock Dep. at 33; Morgan Aff. ¶ 2).

After Nieves' termination, Bullock continued to perform the functions she had done before Nieves' termination, including riding a forklift, pulling orders, printing work orders, moving things around the plant, and unloading and loading trucks, but she acquired three of Nieves' duties.  (Bullock Dep. at 30, 40, 42, 48-49.)  Those additional duties were primarily related to the Honduras facility:

(1) Scheduled containers to be sent to Honduras (Morgan Aff. ¶ 3);
(2) Created export documentation for Honduras containers (Bullock Dep. at 48; Morgan Aff. ¶ 3); and
(3) Responsible for physical count of pallets[25] (Bullock Dep. at 49).

Bullock did not assume the other four duties Nieves performed before his discharge.  Bullock admitted in her deposition that she "turned the invoicing and

---

[25] Defendant disputes that plaintiff performed this duty.  (Morgan Aff. ¶ 2.)

billing over to" Michelle Nielson. (Bullock Dep. at 48; <u>see also</u> Morgan Aff. ¶ 3.)
She also admitted that she did not review inventory levels in the warehouse or
performed inventory transactions to correct any problems. (Bullock Dep. at 46.)
Further, Bullock admitted that she did not keep up with employee work hours, but
that John Wood assumed that duty before Nelson left his employment.[26] (<u>Id.</u> at
44.) Finally, Bullock did not testify that she assumed the duty of completing work
orders as goods came down elevator from weave and knit areas. Instead, the
undisputed evidence is that this work was computerized. (Morgan Aff. ¶ 3.)

Although the evidence establishes that Bullock assumed only a portion of
the duties Nieves performed before his termination, Bullock argues in her brief
that the duties she did not assume were not material. Argument, however, is not
evidence. Bullock has presented no admissible evidence to support her contention
that those four duties were not material. Without such evidence, the court
concludes that those four tasks, which were undisputably not performed by
Bullock, are sufficient to distinguish the primary duties of Bullock and Nieves.
Moreover, even in the absence of evidence of the time spent performing those four
duties, the skills related to those functions certainly are "more than an incidental

---

[26] Defendant contends that John Lloyd assumed these duties as manager of the Greige
Goods warehouse. (Morgan Aff. ¶ 3.)

part" of Nieves's job as a whole, thus rendering the two positions incomparable.

See Mulhall, 19 F.3d at 593.  Accordingly, Bullock has not established the "equal

effort" prong of her prima facie case as it relates to Nieves.  Because each prong of

the tripartite test must be established to fulfill her burden, ECA is entitled to

judgment as a matter of law on Bullock's EPA claim as it relates to Nieves.

### b.  Wayne Johnson

Bullock contends that ECA violated the EPA when it paid Wayne Johnson

more for equal work.  The work at issue was the position occupied by Wayne

Johnson after Bullock's termination.[27]  It is undisputed that Wayne Johnson was

paid more than Bullock.  ECA contends that Bullock failed to establish a prima

facie case under the EPA because Johnson and Bullock did not "perform equal

work requiring equal skill, effort and responsibility."  (Def. Opp. Br. at 7.)  The

court agrees with ECA.

As with Nieves, the thrust of the argument lies with the "equal effort" prong

of the tripartite test.  However, the analysis is much more clear-cut as it relates to

Johnson for one simple reason: Bullock has not presented any admissible evidence

---

[27] As explained in detail above, Bullock contends that Wayne Johnson replaced Bullock in her position.  See supra footnote 18.  This assertion is not supported by any admissible evidence and rejected by the court.  The admissible evidence shows that Johnson was promoted to the position of Greige Goods supervisor.  (Gould Dep. at 75-76; Morgan Aff.)

36

as to Johnson's work duties in his position as supervisor for Greige Goods

Handling, a position he assumed after Bullock's termination.  Plaintiff admitted in

her deposition that she has no personal knowledge of Johnson's duties after her

termination.  (Bullock Dep. at 107.)   Instead, the only admissible evidence

regarding Johnson's duties is the evidence presented by ECA.  That evidence

clearly shows that Johnson and Bullock performed vastly different jobs.  In fact,

none of the duties performed by Johnson were performed by Bullock.  (Morgan

Aff. ¶ 10.)  As Greige Goods supervisor, Johnson performed the following tasks:

>    (1) set up all warehouses on the Lean Manufacturing concept;
>    (2) provided maintenance control related to work orders;
>    (3) set up work orders, variances, and routing;
>    (4) took care of any incomplete orders;
>    (5) managed employees in the warehouse;
>    (6) brought raw material functions from Plant Number 2 that were going
>    across the street to the main plant and managed those raw materials; and
>    (7) traveled to the Honduras facility, set up the warehouse in Honduras, and
>    trained all the new employees in Honduras.

(Gould Dep. at 77.)   Accordingly, Bullock has not established the "equal effort"

prong of her prima facie case as it relates to Johnson.  Because each prong of the

tripartite test must be established to fulfill her burden, ECA is entitled to judgment

as a matter of law on Bullock's EPA claim as it relates to Johnson.

37

2.  Title VII

Title VII makes it an "unlawful employment practice" to discriminate "against any individual with respect to his compensation . . . because of such individual's ... sex," 42 U.S.C. § 2000e-2(a)(1).   Under the McDonnell-Douglas approach, "a female Title VII plaintiff establishes a prima facie case of sex discrimination by showing that she occupies a job similar to that of higher paid males."  Ledbetter v. Goodyear Tire & Rubber Co., 421 F.3d 1169, 1185 (11th Cir. 2005); see also Miranda, 975 F.2d at 1527.  As discussed in detail in Section IV, supra, after the plaintiff has established the prima facie case, the burden shifts to the employer to establish a legitimate, non-discriminatory reason for the disparity.  Burdine, 450 U.S. at 255-56.  Once the defendant has met the burden of articulation, plaintiff must demonstrate that the discriminatory reason more likely than not motivated the employer to pay plaintiff less, or that the employer's explanation is not worthy of belief.  See Burdine, 450 U.S. at 256; Wilson v. B/E Aerospace, Inc. 376 F.3d 1079, 1088 (11th Cir. 2004).

a.  Timeliness

An individual wishing to challenge an employment practice under Title VII must first file a charge with the EEOC. 42 U.S.C. § 2000e-5(e)(1).  In Alabama, a charge must be filed within 180 days "after the alleged unlawful employment

practice occurred," and if the employee does not submit a timely EEOC charge, the employee may not challenge that practice in court. <u>Id.</u>; 42 U.S.C. § 2000e-5(f)(1). "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 113 (2002).

The clock for the 180-day charge window begins when the discrete unlawful practice occurs. <u>Ledbetter v. Goodyear Tire & Rubber Co., Inc.</u>, 550 U.S. ___, ___, 127 S. Ct. 2162, 2169 (2007). "A new violation does not occur, and a new charging period does not commence, upon the occurrence of subsequent nondiscriminatory acts that entail adverse effects resulting from the past discrimination." <u>Id.</u> If an employer uses a pay system that is "facially nondiscriminatory and neutrally applied, a new Title VII violation does not occur and a new charging period is not triggered at the issuance of each pay check." <u>Id.</u> at __, 127 S. Ct. at 2174 (internal quote omitted).

ECA argues that Bullock's pay claim under Title VII fails because she did not timely file a charge of discrimination within 180 days of her assumption of Nieves' duties in May 2005. (Def. Br. at 24.) ECA contends that under <u>Ledbetter</u>, the relevant charge period ended on November 6, 2005, and Bullock's charge was

not filed under March 6, 2006.  (Id. at 25.)  As such, ECA argues that Bullock's pay claim is untimely.  The court disagrees.

While is it true that Bullock assumed the new duties in May 2005 and, at that time, asked for a raise in her pay, ECA never denied Bullock's request. Instead, Bullock was strung along for months by a series of people, all of whom told her either that the raise was forthcoming and to be patient, or that they needed to speak with another person about the issue.  As such, there was never an adverse action[28] about which to file a charge regarding her raise until her discharge in November 2005.  For the court to rule otherwise would give employers the incentive to lead employees to believe that they will receive a raise, but then never institute such a raise and hide behind the 180-day charge window.  Such a result certainly was not intended by Ledbetter.  Therefore, Bullock's pay claim under Title VII is timely.

b.  Circumstantial Case

As explained in detail above, Bullock first must establish a prima facie case of sex discrimination in her pay under Title VII by "demonstrating that she is

---

[28] The last time Bullock asked about the raise was in September 2005, soon after Gould assumed her position as manager of the Greige Goods warehouse.  (Bullock Dep. at 64-65.) Bullock testified that Gould told her that she would have to check with Lloyd and Morgan, but Gould never got back with her about it.  (Id. at 65.)  Even if the court assumed that this response, or lack thereof, was an adverse action, it would have occurred within the 180-day window.

female and that the job she occupied was similar to higher paying jobs occupied

by males." Miranda, 975 F.2d at 1529.   As comparators, Bullock again looks to

Nelson Nieves and Wayne Johnson, male employees who were undisputedly paid

more than Bullock.  However, for the same reasons as stated in the EPA analysis,

Johnson is not a proper comparator, and Bullock may proceed with her Title VII

pay claim only with regard to Nelson Nieves.

　　　Although Bullock failed to meet the more demanding test of "substantially

similar" jobs under the EPA, see id. at 1526, Title VII has a "relaxed standard of

similarity between male and female-occupied jobs."  Id.  The Supreme Court

distinguished the two statutes on the ground that Title VII was designed to

encompass a wider range of employment practices, and noted that constraining

Title VII to the narrow standards of the Equal Pay Act would render a result

unintended by Congress.  See County of Washington v. Gunther, 452 U.S. 161,

178 (1981); see also E.E.O.C. v. Reichhold Chemicals, Inc., 988 F.2d 1564, 1570

(11th Cir. 1993).  Although Title VII affords a plaintiff a less stringent standard of

proof on the similarity of the jobs, the burden remains with the plaintiff to

establish an intent to discriminate, an element not present in the EPA.  Miranda,

975 F.2d at 1526.

Keeping in mind this "relaxed standard of similarity between male and female-occupied jobs," id., the court concludes that Bullock created a question of fact as to whether the job she performed and the job performed by Nieves were similar.  Although Bullock continued to perform her duties on the forklift, after Nieves's termination, she assumed his tasks related to the Honduras facility as well as the duty of counting pallets.  While it is true that she did not assume the duties that would be considered more supervisory in nature, the court cannot say as a matter of law under the relaxed standard emphasized by the Supreme Court and Eleventh Circuit, that Bullock's job was not similar to the job performed by Nieves.  Bullock has done enough to create a question of fact as to this hotly-contested issue.  As such, Bullock established a prima facie case of wage discrimination under Title VII.

ECA did not articulate a legitimate, nondiscriminatory reason for paying Nieves more than it paid Bullock.  Instead, ECA rested its argument on Bullock's prima facie case and the timeliness of her claim.[29] (See Def. Br. at 21-25.)

---

[29] In defendant's reply brief, defendant states that Bullock "was paid differently because she performed different job duties."  (Pl. Reply Br. at 9.)  There is no citation to the record in support of this statement.  Even if the court were to accept this unsupported statement as evidence of ECA's legitimate, nondiscriminatory reason for the disparity in pay, Bullock can establish pretext.  Using the same evidence supporting her prima facie case, Bullock created a question of fact as to whether their jobs were materially different.  Such evidence, taken in the light most favorable to Bullock, is sufficient to allow a rational trier of fact to disbelieve the ECA's proffered legitimate reason, thus permitting, but not compelling, the trier of fact to make a

42

Because ECA has not carried its burden of articulating a legitimate,

nondiscriminatory reason for the pay differential, summary judgment is due to be

denied regarding Bullock's discriminatory pay claim under Title VII as it relates to

Nelson Nieves.  See Burdine, 450 U.S. at 255-56.


## VI.  Conclusion

In summary, the court finds that no material issues of fact remain and that

defendant The Elastic Corporation of America, Inc. is entitled to judgment as a

matter of law as to the following claims asserted by plaintiff: (1) termination in

violation of Title VII and the ADEA; (2) violation of the Equal Pay Act; and (3)

retaliation in violation of Title VII and the ADEA.  Summary judgment is due to

be denied as to plaintiff's Title VII pay claim as it relates to Nelson Nieves.

Plaintiff's motion for partial summary judgment is due to be denied.

---

finding of illegal discrimination.  See Reeves, 530 U.S. at147-48; Abel, 210 F.3d at 1339 (11th
Cir. 2000); Alexander, 207 F.3d at 1336; Combs, 106 F.3d at 1529-38 (interpreting Hicks and
the post-Hicks case law); Hairston, 9 F.3d at 920-21.

A separate order will be entered.[30]

**DONE** this the ___12th___ day of August, 2008.

_____

SENIOR UNITED STATES DISTRICT JUDGE

---

[30]

### VII.  POSTLUDE

The court is satisfied that enough of the time of counsel, as well as the court, has been spent on this case and that the remaining small issue should be resolved by agreement.  Should that not be feasible, counsel for defendant may desire to consider Federal Rule of Civil Procedure 68.

44